UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JUAN CASTILLO and RATAKIT BOONNAK, :
:
                  Plaintiffs :
:
- against - :
:
TIME WARNER CABLE OF NEW YORK CITY, :
:
                  Defendant. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 9, 2011

09 Civ. 7644 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

       Plaintiffs Juan Castillo ("Castillo") and Ratakit Boonnak ("Boonnak") (collectively, "Plaintiffs") bring this action under the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), New York State Human Rights Law, Executive Law §§ 290, et seq. ("NYHRL"), and New York City Human Rights Law, Administrative Code §§ 8-101, et seq. ("NYCHRL") against their employer Defendant Time Warner Cable of New York City ("TWC"), a division of Time Warner Entertainment Company, L.P.  Plaintiffs allege discrimination based on race and national origin, in the form of hostile work environment and disparate treatment, as well as retaliation for engaging in protected activity. (Mem. in Opp. 1.)  Castillo brings an additional disparate treatment claim based on two transfers and two promotion denials.

       TWC moves for summary judgment on each claim.  While TWC has submitted weighty proof, and may well be correct in its position, there is no doubt that there are genuine issues of material fact which preclude granting TWC's summary judgment motion.  Accordingly, the motion is DENIED.

## BACKGROUND

       Castillo, a Hispanic male born in the Dominican Republic, began working for TWC in 1989. (Am. Compl. ¶¶ 11-12.)  He has worked in installation, the warehouse, service,

construction, and as a technician. (Id. ¶¶ 12-18.)  Boonnak, an Asian male born in Thailand, began working for TWC in 1990.  He has worked as an installation technician, and in the warehouse, laboratory department, and service department. (Id. ¶¶ 30-33.)

Castillo alleges that TWC treats nonwhite employees, including himself, differently than white employees. (Id. ¶ 19.)  White employees are disciplined less harshly and given easier jobs in safer neighborhoods and in buildings with working elevators, as well as timely access to NCTI books (which are required to successfully complete courses that impact pay rate and advancement). (Id. ¶¶ 20-20(a).)  In addition, he claims that he was subjected to a hostile work environment, which worsened after he complained about the unequal treatment of nonwhite employees. (Id. ¶ 22.)  He also contends that the supervisors twice failed to promote him to a position for which he was qualified, and twice reassigned him to a less desirable position, both because of his race and national origin, and in retaliation for filing a formal complaint. (Id. ¶¶ 18, 27-28.)  Castillo maintains that his work performance and punctuality have always been satisfactory. (Id. ¶ 17.)

Boonnak makes the same allegations of discriminatory job assignments and discipline, hostile work environment, and retaliation. (Id. ¶¶ 35, 37-39.)  As with Castillo, Boonnak claims that the harassing treatment continued after he formally complained to TWC's human resources regarding the disparate treatment. (Id. ¶¶ 40-42.)   Boonnak also maintains that his work performance and punctuality have always been satisfactory. (Id. ¶ 34.)

Both Plaintiffs allege that TWC's actions are part of a plan, practice, or pattern of discrimination against nonwhite employees and retaliation, which has affected them and others who are similarly situated. (Id. ¶ 26, 42.)

2

**DISCUSSION**

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim demonstrating that it is entitled to relief. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a genuine dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (internal quotations omitted).

**I. Hostile Work Environment**

A hostile work environment claim requires the following elements: (1) the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment; and (2) there is a specific basis for imputing the hostile conduct to the employer. See Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009). Plaintiffs must, therefore, demonstrate that a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted to have altered the conditions of their working environment. Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000). "While a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000) (internal citations omitted). "[I]n the case of a hostile work environment claim, the statute of limitations requires that only one . . . harassing act demonstrating the challenged work environment occur within [the period of limitations]; once that is shown, a court and jury may consider 'the entire time period of the hostile environment' in determining liability. Petrosino v. Bell Atlantic, 385

Case 1:09-cv-07644-PAC   Document 43   Filed 08/09/11   Page 4 of 12

F.3d 210, 220 (2d Cir. 2004) (quoting <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 117 (2002)).

There is no single incident which is extraordinarily severe; instead, Plaintiffs allege that various acts by individuals employed at TWC created a hostile work environment. (Mem. in Opp. 7-8). For example, Castillo alleges that he and other Hispanic workers were called "Dumb Spics," "Dumb Dominicans," and "Rice and Bean Eaters"; this allegation is corroborated by an affidavit from coworker Edwin Maisonet, who heard these comments. Castillo also alleges that, while Italian workers were permitted to speak Italian, when he and other Hispanic workers communicated in Spanish, they were asked "What Banana Boat did you get off[?]," and were instructed not to speak in Spanish and to press the SAP button (a button on the cable device that translates Spanish to English).

Boonnak alleges that his supervisor Peter Samperi called him "Chinky Eyes," mocked his accent, and told him to return to his "Rice Paddy and Water Buffalo birthplace." (Boonnak Decl. ¶ 22; Mem. in Supp. 4.) Coworker David Hardy submitted a corroborating affidavit, stating that he also observed Samperi mimic Boonnak's accent and make derogatory remarks about Thai women. (Mem. Opp. 7-8.) Boonnak also contends that, when he complained about the allegedly hostile work environment, two Human Resources employees told him he should transfer to the offices in Flushing, Queens or Lower Manhattan, which service predominantly Asian districts, to "be with [his] people." (Boonnak Decl. ¶ 8). Finally, he alleges that Foreman Paul Hart posted a list on the bulletin board, on which the words "Jackie Chan" were written next to Boonnak's name; despite Boonnak's protests, this notice remained posted for weeks.

Defendants argue that Plaintiffs have failed to allege that the purported harassment affected their ability to continue to perform their jobs, observing that both Plaintiffs "proudly testified [during their depositions] that they excelled in all areas of their jobs." (<u>See</u> Mem. in Supp. 4 n.2.)

4

Defendants argue that the racist comments allegedly made by employees were no more than petty slights and trivial inconveniences.  Additionally, Defendants that argue Samperi's conduct is not actionable because it occurred prior to September 6, 2006—outside the statute of limitations. (Mem. in Supp. 9.)  TWC argues that each of these incidents is separate and, because they are separate, they are isolated, sporadic, and not part of a pattern.  TWC may well be correct, but its argument does not mean that there are no genuine issues of material fact.

There is ample evidence that Plaintiffs faced pervasive harassment by workplace supervisors, based on their races and national origins.  At the summary judgment stage, since all inferences are drawn in favor of the nonmovant, the proper approach is to view the evidence in its totality and examine the cumulative effect of the acts alleged. See Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).

While some of the evidence of a hostile work environment falls outside the statute of limitations, Plaintiffs have proffered enough acts to satisfy the continuing violation doctrine.  For example, Boonnak alleges that he was told to transfer to an office in an Asian district in 2007; and that the Jackie Chan comment was posted in 2009.  Additionally, the affidavits of Mr. Hardy and Darren Maraj specifically describe sufficient conduct after 2006 to satisfy Plaintiffs' burden. (See Hardy Decl. ¶¶ 4, 5; Maraj Decl. ¶ 11 (attaching a letter, posted on the bulletin board in 2008, which displays animosity towards Hispanics and immigrants); Castillo Decl. ¶ 10 (referring to anti-Hispanic statements as "continuous").)  These incidents are sufficiently related to the other alleged acts of harassment to be part of the same hostile work environment claim. See McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 78 (2d Cir. 2010).  Accordingly, Plaintiffs are entitled to present this claim to a jury.

## II. Disparate Treatment

Discrimination claims, whether brought under Title VII, NYHRL, or NYCAC, are analyzed

5

under the burden-shifting analysis of McDonnell-Douglas Corp. v. Green. 411 U.S. 792, 802-05 (1973). See Thomas v. N.Y.C. Health & Hosps. Corp., No. 02 Civ. 5159, 2004 WL 1962074, at *11 (S.D.N.Y. Sept. 2, 2004).[1] A prima facie case of discrimination may be established where the plaintiff (1) belongs to a protected class; (2) performs duties satisfactorily; (3) is subject to an adverse employment action; and (4) the circumstances of the adverse action give rise to an inference of discrimination based on his membership in the protected class. See Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

The burden at the prima facie stage is de minimis. Id. at 134. To constitute adverse employment action for discrimination purposes, there must be some "materially adverse change in the terms and conditions of employment," as opposed to mere disruption or inconvenience. Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotations omitted). "[T]he challenged action must affect the plaintiff's employment is a way that is both detrimental and substantial." Zhao v. Time, Inc., No. 08 Civ. 8872, 2010 WL 3377498, at *11 (S.D.N.Y. Aug. 24, 2010) (internal quotations omitted).

After the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the plaintiff's termination. See McDonnell, 411 U.S. at 802. Finally, if the defendant has met this burden of production, the plaintiff must produce some evidence that this proffered reason is in fact pretextual. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). "Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." Chambers, 43 F.3d at 38 (internal quotations and citations omitted). At all times, however, the

---

[1] Courts apply the same standard of analysis under Title VII and NYHRL. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000). A more liberal standard applies to NYCAC §8-130. See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009).

6

ultimate burden of persuasion remains with the plaintiff.

The adverse employment actions of which Plaintiffs complain include (1) more burdensome work assignments; (2) increased discipline; and, in Castillo's case, (3) denial of timely access to NCTI books; (4) lateral transfers that were effectively demotions, and (5) failure to promote to a Journeyperson Construction position, a Warehouse Foreman position, and a Technical Operations Foreman position. (Am. Compl. ¶¶ 19-21; Mem. in Opp. 9-11, 14.)

TWC contends that Plaintiffs have not established a prima facie case of discrimination because they did not suffer a materially adverse change in the terms and conditions of their employment. Unfavorable work schedules and insubstantial changes in work conditions alone, TWC argues, do not constitute an adverse employment action. TWC also argues that the circumstances surrounding Plaintiffs' work assignments do not create an inference of discrimination because (1) all work is randomly assigned to technicians from a central dispatch office, so these assignments cannot be attributed to any individuals in the Northern Manhattan office; and (2) at least two of the white employees who Plaintiffs allege receive more favorable assignments identify as Hispanic. (Mem. in Supp. 12-13). TWC also proffers a legitimate nondiscriminatory reason for its actions, claiming that it must provide services to its cable customers, regardless of their location; if Plaintiffs work in undesirable neighborhoods, it is simply because a customer has requested service and not for any other reason. (Id. at 13.)

In addition, TWC claims that the various acts of discipline and disadvantage (i.e., denial of NCTI books) asserted by Plaintiffs are unrelated to race or national origin, and resulted from Plaintiffs' own conduct. Finally, regarding the claims specific to Castillo, TWC maintains that the promotions went to more qualified employees, one of whom is also Hispanic; and that the transfers occurred for legitimate business reasons and do not qualify as demotions. These arguments may be correct, but all of them raise genuine issues of material fact.

Plaintiffs have established a prima facie case of discrimination based on race and national origin. Kaur, 688 F. Supp. 2d. at 331 (quoting Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003). Regarding the second element—adverse employment action—a reasonable jury could find that the routine assignment of nonwhite employees to particular neighborhoods materially altered the conditions of their employment by making the job significantly more laborious and dangerous. For example, coworker David Trojanek stated in his affidavit that burdensome and dangerous job assignments in Harlem, Inwood, and Washington Heights are "known, in our Shop, as punitive assignments meted out by our Foremen" because they often require carrying heavy equipment and extension ladders through tight alleys, past rats and garbage. (Trojanek Decl. ¶ 7.) The punitive nature of these assignment is evidence that they materially impacted employment conditions. See Sanders v. N.Y.C. Human Resources Admin., 361 F.3d 749 (2d Cir. 2004) (finding that transfer to a "crowded, run-down, and vermin-infested building" could be materially adverse). In addition, discipline, denial of requested overtime, failure to promote, and lateral transfers to more burdensome positions are well-established adverse employment actions. See Patrolmen's Benevolent Ass'n. of City of New York v. City of New York, 310 F.3d 43 (2d Cir. 2002); De la Cruz v. N.Y.C. Human Resources Admin. Dep't of Social Servs., 82 F.3d 16, 21 (2d Cir. 1996) (transfer to "less prestigious" unit of social services department with reduced opportunities for professional growth was adverse employment action); Rodriguez v. Board of Educ., 620 F.2d 362, 366 (2d Cir. 1980) (transfer of experienced middle school art teacher to elementary school constituted adverse action).

As to the fourth element, discriminatory intent may be inferred by the comments that support the hostile work environment claim. Plaintiffs also offer evidence that they were disciplined more harshly than white coworkers. For example, Castillo alleges that he was disciplined for taking an extended lunch, while white Technician Quirino Madia was never

disciplined for frequently attending Yankee games during business hours. (Mem. in Opp. 10-11.) Likewise, Boonnak states that he was singled out for discipline following an altercation, for which the two non-Asian participants were not punished. The discriminatory nature of these incidents, and others, are supported by the affidavits of seven other coworkers. (See, e.g., Maraj Decl. ¶¶ 12-13; Trojanek Decl. ¶¶ 9-10; Hardy Decl. ¶¶ 7-9; Puesan Decl. ¶ 10; see also Chambo Decl. ¶ 5; Joseph ¶ 7; Maisonet ¶¶ 6-7.)

In addition, as to Castillo's claim for failure to promote, the allegation that the position went to a less qualified nonminority technician is sufficient to establish an inference of discrimination. See Zimmerman v. Assoc. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001). The Warehouse Foreman position went to Quirino Madia, a white technician alleged to have less seniority and qualification than Castillo. (Mem. in Opp. 14.) Castillo also argues that the legitimate nondiscriminatory reason proffered by TWC—that Castillo lacked required experience in shipping and receiving—was pretextual, based on the fact that Madia similarly lacked such experience. Similarly, Castillo argues that TWC's reason for promoting Shirley Torres—her strong computer skills—is a post hoc rationalization of a discriminatorily-motivated act.[2]

Plaintiffs also offer evidence that TWC's legitimate reason for disproportionately assigning difficult jobs to nonwhite employees—that they are randomly assigned by a computer based on customer need—is merely pretext. Plaintiffs respond that this computer system did not exist until they filed this lawsuit, and that, even when it is used, the dispatchers and foreman still

---

[2] While the Technical Operations Foreman position was given to Shirley Torres (who is Hispanic), there might be a plausible claim of discrimination based on national origin (because Ms. Torres is not Dominican). See Deravin v. Kerik, 335 F.3d 195, 202 (2d Cir. 2003) ("[T]he line between discrimination on account of race and discrimination on account of national origin may be so thin as to be indiscernible."). There is not sufficient evidence here to create a genuine dispute as to discrimination based on national origin. While there are stray comments relating to nationality, as opposed to race (specifically, the comment "Dumb Dominicans" and the reference to Thai women), these comments relate to Plaintiffs' respective races. There is no evidence of any animosity towards Dominican workers specifically, in contrast to Hispanic workers of other nationalities, or towards Thai workers specifically, as opposed to Asian workers of other nationalities. Accordingly, the Court dismisses the claim of disparate treatment based on the promotion of Ms. Torres over Castillo. This promotion may, however, still support the retaliation claim.

change the assignments on a daily basis. (Boonnak Decl. ¶ 9). They also submit an affidavit from Louis Puesan, who worked in the Dispatch Department, which details the discretionary nature of assignment dispatching. (Puesan Decl. ¶¶ 5-9.) This evidence is sufficient to create a genuine issue of fact as to pretext.

### III. Retaliation

Retaliation claims are analyzed under a similar burden-shifting framework as discrimination claims. A prima facie claim of retaliation under Title VII has the following elements: (1) participation in a protected activity; (2) the defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). Informal protests about discriminatory practices, including complaints to management, qualify as protected activity. See Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000). To rise to the level of an adverse employment action for retaliation purposes, the plaintiff must prove that "a reasonable employee would have found the challenged action materially adverse"—a lower bar than for discrimination claims. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

After the plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to proffer a legitimate, nonretaliatory reason for the adverse action. Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552-53 (2d Cir. 2010). If the defendant does so, the plaintiff must produce some evidence that this proffered reason is in fact a pretext for retaliation. Id. at 553.

TWC argues that Plaintiffs have failed to establish any causal connection between the protected activity and adverse action, including temporal proximity; and offers legitimate nonretaliatory reasons for certain adverse actions. For example, it argues that Boonnak was

denied overtime work as discipline for his misconduct in the workplace and that Castillo was denied overtime work for taking a longer lunch than permitted. (Mem. in Supp. 15, 18.)

Plaintiffs rely on their evidence of discrimination to establish causation. They note that they were harassed; unfairly disciplined; assigned to poor working conditions; denied overtime work; and, for Castillo, denied promotions and transferred to positions that were effectively demotions, shortly after complaining to their supervisors about TWC's discriminatory practices. (Mem. in Opp. 13.) They also claim that these adverse acts increased after they filed a second complaint with Corporate Human Resources. (Id.)

This is sufficient to create a genuine dispute as to retaliation. Plaintiffs were engaged in protected activity of which TWC was aware; and Plaintiffs contend they suffered adverse employment decisions by being transferred, disciplined, and denied overtime and promotions. With respect to causality, they allege that much of the discipline and harassment occurred shortly after their first complaint and increased as they continued to pursue their complaint. For example, after Castillo stated at his predisciplinary meeting (concerning his September 2006 extended lunch) that he believed the discipline was racially motivated, General Foreman Lance Giancotti called him a "big mouth" and a "trouble maker," and told him that he would never work overtime on his days off. Castillo alleges that shortly after this meeting, Mr. White told him that he should not have complained of discrimination because Giancotti was having Castillo transferred as a result. Castillo was in fact transferred to Installation in April 2007.

Notwithstanding TWC's arguments and contentions, which may well be true, they do not eliminate the genuine issues of material fact that should be resolved by a jury.

## CONCLUSION

For the reasons stated, TWC's motion for summary judgment is DENIED. The Clerk of Court is directed to terminate the motion at Docket #15.

Dated: New York, New York
      August 9, 2011

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge